## GOMEZ

v.

## CITY TRANSP. CO. OF DALLAS.

### No. 14685.

Court of Civil Appeals of Texas.

Dallas.

Oct. 23, 1953.

Rehearing Denied Nov. 20, 1953.

Reuben Williams, Dallas, Martin & Moore and Elvin Tackett, Fort Worth, for appellant.

Carter, Gallagher, Roberts, Jones & Magee, Dallas, amicus curiae.

Turner, Atwood, White, McLane & Francis, W. D. White and Thos. R. Hartnett, Dallas, for appellee.

DIXON, Chief Justice.

This is an appeal from an instructed verdict in favor of appellee City Transportation Company of Dallas, óne of two defendants in the trial court.

On June 18, 1951 appellant Gomez while walking along Hines Boulevard in Dallas, Texas, sustained personal injuries when struck by a taxicab owned and operated by State Taxicab Company, a corporation, and driven at the time by one of its employees.

Thereafter Gomez sued both State Taxicab Company and City Transportation Company of Dallas, a corporation, alleging that the former was the representative of the latter, hence both were liable to appellant for damages.

City Transportation Company of Dallas filed a motion for summary judgment which was overruled, but at a trial on the merits its motion for instructed verdict was sustained. After return of a jury verdict favorable to appellant, a judgment was rendered against State Taxicab Company for $75,508.50, from which judgment no appeal was taken. Gomez, plaintiff below, has appealed from the instructed verdict in favor of City Transportation Company of Dallas.

Appellee has filed a motion to dismiss this appeal because after judgment was rendered State Taxicab Company paid to appellant the sum of $6,250 in cash and in consideration therefor appellant covenanted not to levy execution against State Taxicab Company.

■ The instrument is a copy in substance of that passed upon in Gillette Motor Transport Co. v. Whitfield, Tex.Civ.App., 186 S.W.2d 90 (writ ref. w. m.). There is a conflict in authority among various jurisdictions as to whether a covenant not to sue operates to release a party not a joint tortfeasor but only secondarily liable for the negligence of another. Boucher v. Thomsen, 328 Mich. 312, 43 N.W.2d 866, 20 A.L.R.2d 1044. We believe the rule in Texas is that a covenant not to sue a person primarily liable, which reserves a right to proceed against a person secondarily liable because of imputed negligence, does not operate to release the latter. Blackwell v. Ship Channel Development Co., Tex.Civ. App., 264 S.W. 223 (writ dis.). Appellee's motion to dismiss appeal is overruled.

The main contention of appellant is that under the undisputed facts disclosed by the record it must be held as a matter of law that the State Taxicab Company was the representative of City Transportation Company of Dallas; hence the latter is liable to appellant for his damages of $75,508.50

which the jury found were the result of the negligence of the employee of State Taxicab Company. In view of this contention it is necessary for us to examine carefully the entire record before us.

State Taxicab Company and its predecessors under permits issued by the City of Dallas operated cabs in the City of Dallas for many years prior to the granting of a franchise to City Transportation Company of Dallas and its predecessors. Originally conducted as a sole proprietorship owned by J. H. Waller, State Taxicab Company is now a corporation whose president is Mrs. J. H. Waller, surviving widow of the former sole owner. Its principal business is the carrying of Negro passengers, though upon request it carries white passengers.

City Transportation Company of Dallas, a corporation, was organized in 1950 as successor to City Transportation Company which was also a corporation. The latter company was by City ordinance granted a franchise to operate a taxicab service in Dallas for a term beginning Sept. 1, 1940 and expiring Dec. 31, 1956. When the new corporation succeeded the old corporation in 1950 it succeeded also to these franchise rights. Its principal business is the carrying of white passengers, but upon request it carries Negro passengers.

Appellant relies chiefly upon documentary evidence to make out his case. Here is a summary of this documentary evidence:

(1) Chapter XX of the Charter of the City of Dallas provides that "The ownership, right of control and use of the streets, highways, alleys, parks, public places and all other real property of the City of Dallas is hereby declared to be inalienable to said city, except by ordinances passed by * * by the governing body * * *; and no franchise or easement involving the right to use same * * * shall ever be valid, unless expressly granted and exercised in compliance with the terms hereof, and of the ordinances granting the same. * * *."

(2) Ordinance No. 3113 granted a franchise to appellee (originally to appellee's predecessor) to operate a taxicab service

for a term beginning Sept. 1, 1940 and expiring Dec. 31, 1956. The record indicates that this is the only franchise granted by the City for the operation of a taxicab service. It provides that appellee may conduct its operations "through divisions, or units, under trade names, or trade marks, or through operating companies, provided each such operation shall first be approved by the governing body of the City of Dallas by resolution duly adopted, * * *."

(3) A resolution passed by the City Council, dated Oct. 31, 1950, recites in its preamble that operators of taxicabs for Negroes in the City of Dallas had represented that the City's requirements of a cash deposit or a public liability policy, or bond, for the protection of persons injured through negligent operation of the cabs, were too burdensome; and that it was deemed advisable that standards be established by the City Council for operating taxicabs for carrying colored passengers.

We quote pertinent parts from the body of the above resolution:

"That any operator of a taxicab for colored passengers only who was operating such taxicab business on September 15, 1942, * * * may file an application with the Supervisor of Public Utilities to approve an operating contract between such applicant and the City Transportation Company, which said operating contract shall provide generally as follows: * * * Said applicant shall agree in writing that he will operate said cab or cabs under the supervision of the Supervisor of Public Utilities at all times, * * *. * * * the applicant will pay over to the City Transportation Company * * * 4% of the gross receipts * * * and the City Transportation Company shall agree that it will make such collections and pay the same over to the City of Dallas. * * * the applicant will pay to the City Transportation Company or its nominee the premium fixed by the State Insurance Commission. Said sum of money shall be used to procure insurance coverage for public liability * * *.

"In consideration of the above, and applicant's agreement to hold the City Transportation Company harmless, the City Transportation Company shall agree that it will obtain such insurance coverage for applicant at cost and without fee * * * *but City Transportation Company shall assume no control or management of applicant's business.*" (Emphasis supplied.)

(4) A contract dated October 31, 1950 between State Cab Company and appellee recites in its preamble that operators of taxicabs for Negroes had represented to the City that the requirements of the ordinance with respect to a cash deposit with the City of Dallas for the protection of persons injured through the operators' negligence, were too burdensome; that the City had therefore required such operators to carry $2,500 insurance per person and $5,000 for any number of individuals injured in a single accident, and $1,000 for property damage; that the City had levied a 4% gross receipts tax for the use and benefit of the City; and that the City had delegated to appellee the duty of collecting the 4% tax and had further delegated to appellee the duty of collecting the insurance premiums necessary to carry the above required insurance.

We quote pertinent excerpts from the body of the contract:

"* * * from and after the approval of this contract by the City of Dallas, State Cab Company is authorized by the City of Dallas to operate * * * a colored taxicab business * * * State Cab Company shall assume full responsibility of the government and discipline of its employees. * * * Every vehicle operated under the terms hereof by the above named State Cab Company shall have permanently painted thereon the name of State Cab Company, and if said State Cab Company is not the owner thereof, in addition thereto, have the name of

the owner thereof * * *. * * * State Cab Company shall pay to the City Transportation Co. of Dallas for the sole use and benefit of the City of Dallas * * * four percent of the gross receipts * * * The City Transportation Co. of Dallas shall * * * remit the total amount thereof to the City of Dallas. * * * State Cab Company shall pay to the City Transportation Co. of Dallas, or its nominee, the monthly insurance premium as fixed by the Board of Insurance Commissioners * * * which sum shall be used by the City Transportation Company of Dallas to procure insurance coverage for public liability and property damages * * *. If the City Transportation Co. of Dallas is unable to continue to procure the insurance called for in this contract, (because no insurance company will write the risk), then the City Transportation Co. of Dallas shall give the City of Dallas ninety (90) days' notice of such fact and at the expiration of such ninety (90) days' notice the City Transportation Co. of Dallas is no longer obligated to provide such insurance. * * * It is further agreed that the City Transportation Co. of Dallas' responsibility and duty hereunder is strictly limited to: (a) the collection of the 4% gross receipts tax from State Cab Company and its prompt remission in full to the City of Dallas; and (b) collecting the money for the insurance premium as herein set forth and seeing to it that each cab substituted or each addition to the fleet is covered by the insurance as herein required at the time of the approval by the Supervisor of Public Utilities. In consideration of the agreement of City Transportation Co. of Dallas to obtain the insurance hereinbefore referred to * * * State Cab Company does * * * agree to save and hold harmless the

said City Transportation Co. of Dallas, a corporation, and the City of Dallas, from any and all claims, actions, causes of action and suits growing out of its operation of its business hereunder, * * *."

W. D. White, attorney for appellee and a member of its Board of Directors, testified in an oral deposition in substance as follows: At the request of the City appellee caters primarily to white passengers, but it does carry Negro passengers; it is not to the interest of appellee to have companies in Dallas to cater to the Negro trade in order to relieve appellee of the necessity of carrying Negro passengers; appellee would like to have a division to carry Negro passengers and, if it did, would have colored drivers; the duty of collecting the 4% tax and seeing that the colored cabs carried public liability insurance was delegated to appellee by the City at the City's request; appellee receives no money consideration for such service; the insurance is carried by the Pan-American Insurance Company of Houston, which is the only insurance company that would write it; there is no connection between appellee and State Taxicab Company except to the extent set out in the contract; the present contract is very dissimilar to a previous contract between City Transportation Company (appellee's predecessor) and State Taxicab Company; appellee has made this same agreement, at the request of the City, with four Negro cab companies of which State Taxicab Company is one; when the old contracts expired appellee notified the City that it would not renew the contracts, but at the City's insistence, appellee consented to the new changed contracts; as to why appellee entered into the contracts, it was done at the request of the City which insisted on delegating to appellee the City's duty of collecting the tax and seeing that public liability insurance was carried; appellee was in no position to refuse the City's request; * it was a dead expense to

* If appellee had no interest in State Taxicab Company and would not be benefitted by the contract, why did appellee enter into the contract? This question was

asked from the bench during oral argument of the case. In reply appellee's counsel stated that appellee at first refused to do so, and reluctantly consent-

appellee; the City told appellee that prior to such arrangement it had been difficult to get any money out of a colored cab following an accident.

Parts of an affidavit by J. W. Monk, Supervisor of Public Utilities, were introduced in evidence without objection. Omitting legal conclusions, the affidavit states in effect that the City for more than twenty years has licensed State Taxicab Company to operate cabs; that the City asked appellee to collect the 4% tax for the City and see that insurance was carried by four colored taxicab companies; Mr. White had informed affiant that appellee did not wish to renew the contracts; that negro operators had advised affiant that they could not secure insurance and it was his desire as Public Utilities Supervisor to have Mr. White assist them so that the public would have some protection.

We find no evidence in the record that appellee controlled the business and operations of State Taxicab Company, that appellee owned the vehicle involved in the accident, that appellee stood to profit from the operations of State Taxicab Company, or that appellee had any financial interest in the operations of State Taxicab Company. There is no evidence that the two companies were owned by the same stockholders, that they had interlocking directorates, that State Taxicab Company was a subsidiary of appellee, or that appellee had any connection whatsoever with State Taxicab Company except that shown by the contract of Oct. 31, 1950. Further, and we think the point is material here, we find no evidence that appellee ever asked or contracted with State Cab Company to perform any service for appellee, or that appellee has ever referred to State Taxicab Company any business tendered to appellee for the carrying of any passengers, white or Negro.

■ The evidence shows that appellee acted as representative of State Taxicab Company for the limited purpose of collecting and remitting the gross receipts tax and of using the insurance premiums to provide insurance coverage for State Taxicab Company; but we find no evidence that the State Taxicab Company has acted as representative of appellee in the performance of any of the latter's business.

Appellant's position, set out in his first, second and third points on appeal, is that since the City may grant a franchise for cab service only by ordinance, and since appellee is the only cab company which has been granted a franchise by ordinance, State Taxicab Company is performing taxicab services which it is the duty of appellee to perform, hence must be regarded as appellee's representative, making appellee liable in damages for the tortious acts of State Taxicab Company's employees.

We have searched the record and find no evidence of any. connection between appellee and State Taxicab Company other than that shown by the resolution and contract. Is the relationship reflected by those documents of such a nature as to cast legal liability upon appellee for the tortious acts of employees of State Taxicab Company? We think not.

■ We recognize the general rule of law that a common carrier cannot delegate its duties and responsibilities arising from its franchise by contracting or sub-contracting with others as employees, agents, or even as independent contractors to do its work, and thus avoid liability for the negligent acts of such employees, agents, or independent contractors. But we do not believe any such situation is presented by the facts now before us. As stated before, appellee has not asked or made any contractual arrangements for State Taxicab Company to handle any of appellee's business.

ed only because of the City's insistence. Counsel in further explanation stated that appellee was in no position to refuse the City's request because appellee's franchise will expire in 1956. Appellee expects to ask for a renewal, and feared a refusal would incur the displeasure of the City authorities, thus jeopardizing appellee's chances for having its franchise renewed.

Appellant asserts that State Taxicab Company is operating as a unit of appellee, and that the contract is a scheme by which appellee seeks to avoid its duty to carry Negro passengers. There is no evidence to that effect in the record. It was at the request of the City—the insistent request of the City—that appellee reluctantly entered into the contract. And under the very terms of the agreement appellee's duties are limited as hereinbefore set out. We think there is no liability under the circumstances here present where it is not shown that State Taxicab Company was operating under any permit or franchise issued to appellee, but was operating independently under a purported grant, whether legal or not, which came direct from the City itself.

■ Appellee's franchise does not purport to be an exclusive franchise, nor may it be given such an effect by interpretation, for exclusive franchises from municipalities are forbidden in this State. Const. Art. 1, sec. 26, Vernon's Ann.St.; Templeton v. City of Wellington, Tex.Civ.App., 207 S.W. 186; 39 Tex.Jur. 626.

Appellant cites Pan-American Casualty Co. v. Basso, Tex.Civ.App., 252 S.W.2d 505, in support of his contention. The opinion in the cited case does indeed contain a statement that the North Dallas Taxicab Company was an agent or representative of the City Transportation Company. However it is obvious that the court was there considering another and different contract than the one now before us, for the judgment of the trial court in the cited case was dated Oct. 5, 1950, and the contract before us was not executed until Oct. 31, 1950. Moreover in the cited case the question before the Court involved the liability of the insurance company, not the liability of City Transportation Company. In fact the latter Company was not even a party to the suit. It is plain that the Court in Pan-American Casualty Co. v. Basso, supra, had before it issues of fact and law which differ from those presented to this Court in the instant case.

Appellant also relies upon the case of Venuto v. Robinson, 3 Cir., 118 F.2d 679.

We think the fact situation in that case was quite different from the fact situation shown by the record here. There Robinson was carrying freight for C. A. Ross, Agent, Inc. The freight had been entrusted to C. A. Ross, Agent, Inc., who then made arrangements for Robinson to do the actual hauling. Thus Robinson unquestionably became the agent of C. A. Ross to perform services for the latter. In the case before us there is no evidence that appellee ever turned over any of its business or services by contract, subcontract, or simple request, to State Taxicab Company for handling, or that it ever even referred any business to State Taxicab Company.

Another case cited by appellant is Davis v. Employers Casualty Co., Tex.Civ.App., 214 S.W.2d 642. We do not think it is in point, for there again the facts show clearly that Davis engaged persons to transport freight which Davis himself had contracted with other persons to transport. Thus Davis in effect sublet his contracts, and under the circumstances he was held liable. No such relationship is disclosed in the record before us.

It seems to us that a case nearer in point is Houston E. & W. T. Ry. Co. v. Anderson, 120 Tex. 200, 36 S.W.2d 983. There the defendant had leased its properties to the Texas and New Orleans Railroad, which lease had been approved by the Interstate Commerce Commission. It was held that the defendant company was not liable for the tortious acts of the employees of the Texas and New Orleans Railroad. See also Estes v. Memphis & C. Ry. Co., 152 Miss. 814, 119 So. 199; Cushman Motor Delivery v. Smith, 51 Ohio App. 421, 1 N.E.2d 628.

Appellant's first, second, and third points are overruled.

■ In his fourth point appellant contends that the trial court, having overruled appellee's motion for summary judgment, may not thereafter in a trial on the merits sustain a motion for instructed verdict when the facts as shown by both records are substantially the same. Appellant says that

under such circumstances the action of the court in overruling the motion for summary judgment is res adjudicata as to the law point involved.

It has been held that a judge may properly withdraw a case from a jury though he has previously overruled a motion for instructed verdict. Condra v. Grogan Mfg. Co., Tex.Civ.App., 228 S.W.2d 588, affirmed 149 Tex. 380, 233 S.W.2d 565. We think appellant's point is analogous to the contention of appellant in the above cited case. See also Handy v. Olney Oil & Refining Co., Tex.Civ.App., 68 S.W.2d 313 (error ref.). We overrule appellant's fourth point.

The judgment of the trial court is affirmed.